# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11891-RCL

|  |  |
|---|---|
| **DIANE HURLEY,** | ) |
| Plaintiff | ) |
|  | ) |
| v. | ) |
|  | ) |
| **RANGELEY LAKE DEVELOPMENT** | ) |
| **CO., LLC, PAUL PECK & PERRY D.** | ) |
| **WILLIAMS,** | ) |
| Defendants | ) |
|  | ) |

### AFFIDAVIT OF KEVIN HURLEY
### (SUBMITTED IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS)

I, Kevin Hurley, do hereby depose and say of my own personal knowledge that:

1.  I am a resident of Massachusetts.

2.  This affidavit is based upon my personal knowledge except where designated upon information and belief and in those instances based on my longstanding employment and knowledge of the parties I believe the statements to be true.

3.  I have read the affidavits of Diane Hurley and Charles Mathison and believe them to be true and accurate in all respects.

4.  I have read the Complaint filed in this action by Diane Hurley and the complaint filed by me in the companion case of <u>Kevin Hurley   v. Rangeley Lake Development Company, LLC, et al.</u>, United States District Court, District of Massachusetts, Civil Action No. 04-11892-NG, and I incorporate the factual allegations contained therein into my affidavit.

1

5.    I have read the affidavit of Paul Peck and Perry Williams and I submit herewith that the following paragraphs are incorrect and/or misleading.

6.    As hereinafter set forth that I believe paragraphs 6, 7 and 8 of Paul Peck's affidavit are incorrect and/or misleading.

7.    As hereinafter set forth I believe paragraphs 2, 4, 5, 6, 7, 9, 10, 12, 16, 17, and 20 of Perry Williams' affidavit are incorrect and/or misleading.

8.    I have learned from reading the affidavit of Perry Williams that the correct name of the Defendant is Rangeley Lake *Resort* Development Company a Maine Limited Liability Company with offices in Portland, Maine. All references to Rangeley Lake Development Company are intended to mean or include Rangeley Lake Resort Development Company and both are hereinafter collectively referred to as RL.

9.    I am informed and believe that the ownership of both companies are by the same people and, based upon my understanding as manager of the Salem, New Hampshire office that Rangeley Lake *Resort* Development Company totally controlled and dictated the Salem, New Hampshire Office.

10.   Both my wife, Diane Hurley and I were told that they were going to call the Salem, New Hampshire office, Rangeley Lake Vacation Club, however we were not advised that it was a different corporation. We were controlled and directed by RL at all times and reported to them. I believed the name Rangeley Lake Vacation Club was used as a marketing tool.

11.   The defendant is misnamed in the caption but I believed it to be the same company and I am informed and believe that the service of my complaint and the complaint

2

in the companion case filed by my wife was served and delivered to the Defendant as named and received by Rangeley Lake *Resort* Development Company at the same address.

12. My primary occupation is as a consultant and/or sales representative with respect to timeshare sales and marketing.

13. I have maintained an office at my home in Stoneham, Massachusetts for many years.

14. In or about April and May of 2003, the Defendant Rangely Lake Development Company, its agents, representatives and/or employees placed a classified advertisement for employment opportunities within the *Resort Trades Magazine* ("RTM"). My wife and I received it at our then home and office in Stoneham, Massachusetts.

15. The article was seeking to employ persons to open a Boston area office.

16. In or about May 2003, I began negotiations via telephone, email and facsimile from my home office with RL agents, representatives and/or employees regarding the opening of an RL office in the metro-Boston area.

17. I also traveled from Massachusetts to Portland, Maine to meet with, Perry Williams ("Williams") one of RL's owners and its Director of Sales, Patrick Warner ("Warner") to discuss opening an office in Woburn Massachusetts to sell its timeshares to Massachusetts residents.

18. During these negotiations we began scouting locations in the Woburn area.

3

19. Perry Williams and Patrick Warner traveled to Massachusetts and together with myself we investigated various office locations in particular Cummings Park in Woburn Massachusetts and locations in Reading, Massachusetts.

20. The purpose of the location was to do business by attracting Massachusetts residents to purchase time shares in Maine.

21. I advised them that the Woburn/Reading area was saturated and we should open an office in Salem, New Hampshire, which would allow us to do business in Massachusetts from our office in Salem, which was just over the border.

22. After numerous phone conversations placed from my Stoneham, Massachusetts residence I advised that we open an office in Salem, New Hampshire because it would be sufficiently removed form the Woburn area, which was heavily saturated and would provide a location close enough to Massachusetts to target its residents to travel to Salem.

23. I was instructed to travel from Massachusetts to Portland Maine to meet with Paul Peck before I could be hired, during which we again discussed opening an office in Woburn Massachusetts to sell its timeshares to Massachusetts residents.

24. At the meeting my wife and I met with the owners, Paul Peck, Perry Williams, and Patrick Warner their Sales Director. We conveyed to them that we were willing to do whatever it took to make this project a success.

25. Paul Peck in particular continued to push for a Boston location to sell and service Massachusetts residents as the main component of the business.

26.    In early June, after being convinced they could do business in Massachusetts from the Salem office, Perry Williams offered me a Sales Manager position, as an "independent contractor" and I accepted it.

27.    No written contract was signed at this time, however, Perry Williams instructed me to work from my home in Stoneham as an independent contractor, to recruit sales reps from within Massachusetts and to find a suitable Massachusetts location to open a RL office for the purposes of selling its Maine timeshares to Massachusetts residents.

28.    I explained that I knew of other potential sales candidates including my wife, Diane Hurley ("Diane").

29.    RL's telemarketing efforts were directed towards drawing clients from the Commonwealth of Massachusetts, up to and including registering for receipt of the "DO NOT CALL LIST" within Massachusetts.

30.    On, June 18, 2003 I received an email from Patrick Warner, at my AOL email account (monstamarketing@aol.com, which is shared with my wife) regarding RL's Salem office. (See Patrick Warner Email to Kevin Hurley attached hereto and incorporated herein by reference) The e-mail put in writing the salary of One Hundred Sixty Four Thousand ($164,000.00) per year based on a five-year project. The email also stated that the Salem office would open in one week.

31.    The e-mail further stated that I would work with them in Maine before transitioning back to Massachusetts to work from my home in Stoneham as an independent contractor, to recruit sales reps from within Massachusetts and to find

5

a suitable Massachusetts location to open a RL office for the purposes of selling its Maine timeshares to Massachusetts residents.

32.    In fact, the Corporation which Defendant alleges is the appropriate Corporation was not formed until July 7, 2003. (See Annual Report History Document attached hereto) after our agreement was reached.

33.    I operated out of Massachusetts with weekly trips to Maine until the Salem office opened in October 2003.

34.    After requesting it for months, I executed an independent contractor agreement with RL, I believed, signed by Perry Williams. (See Independent Contractor Agreement Kevin Hurley attached hereto and incorporated herein by reference)

35.    RL's telemarketers heavily targeted Massachusetts citizens and enticed them to travel to New Hampshire to attend timeshare presentations.

36.    We specifically offered potential Massachusetts clients that traveled to the Salem New Hampshire location, for sales presentation, free weekend getaways such as at the *Oak and Spruce Resort* in Lee, Massachusetts and/or at a Cape Cod resort located in the Hyannis area.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 22 DAY OF MAY, 2005.**

KEVIN HURLEY

6

| Subj: | **Salem Office** |
|-------|------------------|
| Date: | 6/18/03 6:54:31 AM Pacific Daylight Time |
| From: | PLWarner12@cs.com |
| To: | Monstamarketing |

Kevin,

We would like to bring you up on Tues. the 24th to work with us here for a week, then transition back to your house to start running ads and hiring reps, office and exit personnel. We'll pay you a flat 1000.00 a week for those weeks and start your regular pay plan the first week we open, which should be 7/15. Based on that date we should have everyone hired by Mon. the 7th. That would give us a full week to train and help decorate the office.
Here's the pay plan Perry suggested: $750 a week plus overrides and bonuses, @ 1301eff/2pts, @1201eff/1.75 pts, @1101eff/1.5 pts, @1001eff/1.25 pts , @901eff/1 pt and at anything below 900 there is no override.

Here's how we figure it:
10 reps@40 per mont each
400 tours a month x 15.6 gross close
62.4 gross sales x 18% cxl =
51.17 net sales x 10500 avg sale price
537,287 net volume per month
3000 per month salary
The previous formula gives you a 1343 eff
Override would be 10,745 + 3000= 13,745 mox12mos=164,940 yearly
We also offer a yearly bonus based on a total yearly volume thats kinda negotiable between Perry and yourself. I know those eff. look high and you feel just like I did a year ago that it would be impossible to obtain but 1200 is very easy and 1300 is not hard either, I'll show you all the numbers when you come up.
And remember we would like 15 reps not just 10 and we pay you per exit sold as well and cover all expenses.

Let Me Know,
Patrick

Business Entity



**Corporation Divis**

Search
By Business Name
By Business ID
By Registered Agent
Annual Report
File Online

**Date:** 5/16/2005    **Filed Documents**
(Annual Report History etc.)

## For a blank Annual Registration Report, click here.

Business Name History

| Name | Name Type |
|---|---|
| RANGELEY LAKE VACATION CLUB, LLC | Legal |

478383 - New Hampshire - Information

| | |
|---|---|
| **Business ID:** | 444059 |
| **Status:** | Active |
| **Entity Creation Date:** | 7/7/2003 |
| **State of Business.:** | NH |
| **Principal Office Address:** | 7 A RAYMOND AVE.<br>SALEM NH 03079 |
| **Principal Mailing Address:** | 7 A Raymond Ave.<br>Salem NH 03079 |
| **Expiration Date:** | Perpetual |
| **Last Annual Report Filed Date:** | 4/12/2004 |
| **Last Annual Report Filed:** | 2004 |

Registered Agent

| | |
|---|---|
| **Agent Name:** | MICHAEL J. IACOPINO, ESQ. |
| **Office Address:** | 85 BROOK ST<br>MANCHESTER NH 03104 |
| **Mailing Address:** | |
| **[Name Not Available]** | [Address Not Available] |

### NEW! File Annual Report Online.

## INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT made and entered into this 15th day of October, 2003, by and between Rangeley Lake Vacation Club, LLC with a place of business at 190 Riverside Street, Unit 2B, Portland, Maine 04103 ("Company") and Kevin Hurley of Stoneham, County of Middlesex, Massachusetts ("Hurley");

*WHEREAS*, the Company sells timeshare estates; and

*WHEREAS*, the Company desires to hire Hurley as an independent contractor as Sales Manager of the Company's Salem, NH office; and

*WHEREAS*, Hurley desires to act as an independent contractor as Sales Manager of the Company's Portland office.

*NOW, THEREFORE*, in consideration of the recitals above which are hereby incorporated into this Agreement and the mutual promises and covenants contained herein, the parties agree as follows.

1.    Position. Hurley will be the Sales Manager for the Company's Salem, NH office.

2.    Employment Status. Hurley will at all times act as an independent contractor of the Company and will not be an employee of the Company.

3.    Duties. Hurley's primary duty to the Company will be to efficiently sell its timeshare units. Hurley's duties will include, but will not be limited to helping the sales representatives in the closing process and hiring and training of sales representatives.

4.    Supplies. Hurley will furnish all necessary training materials, supplies and materials necessary to effectively carry out his duties hereunder.

5.    Performance Standards. The Company shall not control Hurley in his day-to-day activities in carrying out his duties hereunder. Hurley will have monthly performance standards. Those standards will be based on volume per guest ("VPG"). VPG means the total monetary value of good business

divided by the total number of qualified tours. Good business for the purposes of this Agreement shall mean any customer that qualifies for funding of his timeshare estate purchase or pays cash and does not rescind. VPG does not include penders. When a pender becomes good business, it shall count in that month's VPG calculation.

      6.      Term. The term of this Agreement will commence on September 1, 2003 and end on August 31, 2004 unless earlier terminated pursuant to the terms of this Agreement. At the end of the initial term of this Agreement and any additional terms, the term shall automatically be extended for an additional one year term provided neither party gives the other written notice of its intent to terminate. The written notice to terminate must be provided no later than 30 days prior to the expiration of the current term.

      7.      Compensation. Hurley will be compensated as follows:

            (a)      $ 750 per week, except those weeks when the sales offices are closed for any reason and those weeks Hurley is not providing services pursuant to this Agreement, for the term of this Agreement payable on Friday of each week; partial weeks will be compensated by dividing $ 750 by 7 days, the sum then multiplied by number of days services are provided.

            (b)      2% override on the gross monthly volume of all good business generated at the Company's Salem sales office provided that month's VPG in Salem is $ 1,201 or above, payable on the 15th day of the following month; or

            (c)      1.5% override on the gross monthly volume of all good business generated at the Company's Salem sales office in the event that month's VPG in Salem is between $ 1,101 and $ 1,200.

2

(d)     1% override on the gross monthly volume of all good business generated at the Company's Salem sales office in the event that month's VPG in Salem is between $ 1,001 and $ 1,100.

(e)     .5% override on the gross monthly volume of all good business generated at the Company's Salem sales office in the event that month's VPG in Salem is between $ 901 and $ 1,000.

(f)     0% override on the gross monthly volume of all good business generated at the Company's Salem sales office in the event that month's VPG in Salem is under $ 900.

(g)     A year end bonus based on the Company's Salem sales office total volume as follows:

| Total Volume | Bonus |
|---|---|
| $ 6,000,000.00 | $  5,000.00 |
| $ 8,000,000.00 | $ 10,000.00 |
| $ 10,000,000.00 | $ 15,000.00 |

8.  Reserve Account.  The Company will establish a non-interest bearing bank account at a banking institution of its choice to hold 10% of Hurley's initial overrides until the account has a balance of $ 2,000.  The said bank account shall be called the "Reserve Account" or "the account".  The account's funds may be co-mingled with the reserve account funds of the company's sales executives. The purpose of the reserve account is to protect the Company in then event any purchaser of a timeshare unit from the Company ("Purchaser") defaults during the charge back period under its timeshare purchase loan after Hurley has already been paid his override on that defaulted timeshare loan.  Default for the

3

purpose of this Agreement shall mean when a timeshare purchaser is sixty (60) days or more late in making his payments under the timeshare purchase loan's note.

Hurley's Reserve Account shall always maintain a balance of $ 2,000. If Hurley's Reserve Account, at any time, falls below $ 2,000, all overrides due Hurley will be credited to the Reserve Account until the account balance again reaches $ 2,000. When the Reserve Account balance reaches $ 2,000, Hurley shall receive 100% of all earned overrides.

The charge back period referenced above shall be twelve (12) months from the end of the Purchaser's rescission period. In the event a Purchaser is in default under its timeshare purchase loan, the Company shall deduct from Hurley's Reserve Account the override he earned on the sale to the defaulted Purchaser. On a quarterly basis, the Company shall deduct those sums that are permitted under this paragraph and the Company shall provide Hurley a written summary of the activity of the account.

9. Termination. This Agreement may be terminated by either party by giving 14 days written notice to the other. The Company reserves the right to immediately terminate this Agreement in the event of Hurley's willful breach of the terms of this Agreement, misconduct or any breach of the law that has a negative impact on the Company.

10. Limited Period of Non-Competition/Non-Piracy. The parties hereto recognize that the business conducted by the Company is very competitive and one in which preservation of customers and protection of confidential information is of great importance to the Company. Accordingly, the Company and Hurley agree as follows:

(a)       Non-Competition. Hurley, for so long as he is the Sales Manager in the Company's Salem office and for a period of eighteen (18) months following the expiration of the term of this Agreement or from the time of the termination of this Agreement, whichever date is later, will not (i) directly or indirectly engage in, manage, operate, join, control or participate

4

in the ownership, management or control of, or be connected in any

manner, whether as employee, consultant or independent contractor, with

any business competing in the State of Maine or State of New Hampshire

in the timeshare sales business with the Company or any division, affiliate

or subsidiary of the Company; and (ii) directly or indirectly, on behalf of

any person, firm or corporation, call, solicit or sell to any person, company

or business interest any timeshare product in the State of Maine or State of

New Hampshire. The term "timeshare product" shall mean but not be

limited to.

(b)    Confidential Information. All contracts, books, records, notes, blanks, forms,

supplies, materials, computer programs, files, customer lists, prospect lists and similar data,

documents and information relating to the customers and business of the Company, including but

not limited to names of customers, contracts, contract expiration dates, contract terms, conditions

and rates, whether such documents, information and material were or were not compiled, obtained

or generated by the Company (hereinafter collectively referred to as "confidential information")

are the property of the Company. Confidential information shall not include any information that

Hurley was in possession of prior to the signing of this Agreement; and

(c)    Use of Confidential Information. The confidential information shall always

remain the property of the Company and the same shall not be removed or copied in whole or in

part by Hurley at any time, prior to or after such termination of his contract, nor be used in any

way for the benefit of any person or business entity save and except the Company. All of such

confidential information shall upon termination of Hurley's contract be returned forthwith to the

Company and the Company shall (in addition to all other remedies and damages available) have

the right of specific performance to obtain such documents, information and material.

5

(d)    Nondisclosure. Hurley both during and following his time as an independent contractor for the Company shall not divulge to others or use, for his own benefit, any confidential information as defined above, including but not limited to, information relating to the business, sales or clients of the Company.

(e)    Remedies. The Company and Hurley acknowledge that the breach of any covenants contained in Paragraphs 9.a, b, c and d above will cause the Company irreparable damage, for which no adequate remedy at law exists. It is agreed that in the event of any such breach, and in addition to any other rights and remedies available, including the right to monetary damages, the Company shall be entitled to an injunction to restrain the breach by Hurley and/or his partners, agents, servants, employers, employees, and all persons acting for or with Hurley, and in the event of any breach Hurley consents to the issuance of an injunction by any court of competent jurisdiction. If Hurley violates this paragraph of the Agreement, he will agree to pay all reasonable attorneys' fees and costs incurred by the Company in enforcing any covenant contained in this Agreement.

11.    Default. In the event either party defaults under the terms and condition of this Agreement, the injured party shall have any and all rights available to him or it at law and equity.

12.    Confidentiality.    The Company and Hurley agree that this Agreement is expressly confidential and they shall never disclose any terms of this Agreement or the considerations underlying this Agreement with any third party.

13.    Notices.    All notices required or permitted to be given under this Agreement shall be given by certified mail, return receipt requested, to the parties at the following addresses, or to such other addresses as either party may designate in writing.

     If to Company:       Perry D. Williams, Manager
                       Rangeley Lake Vacation Club, LLC
                       190 Riverside Street

6

Portland, Maine 04103

If to Hurley:                                    Kevin Hurley
                                                 92 Oak St.
                                                 Stoneham, MA 02180

14.    Arbitration.  Any dispute, controversy, or claim arising out of or relating to this Agreement or any alleged breach thereof shall be submitted to arbitration in Portland, Maine in accordance with the governing rules of the American Arbitration Association.  Judgment upon any award rendered may be entered in any court of competent jurisdiction.

15.    No Assignment.    This Agreement is personal to Hurley and the rights, duties, obligations, and benefits hereunder may not be assigned by Hurley.

16.    Binding Effect.        The rights, duties, obligations, and benefits contained in this Agreement relative to the Company shall be binding upon and inure to the benefit of the Company and its successors and assigns.

17.    Governing Law.    This Agreement has been made in and shall be governed by the laws of the State of Maine.

18.    Severability.    The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any single provision shall not affect the validity or enforceability of any other provision hereof.

19.    Entire Agreement.    The foregoing contains the entire agreement of the parties with respect to the subject matter hereof, and may not be altered or amended except by written instrument signed by the parties.

20.    Counterparts.    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  The parties may transmit executed copies of this Agreement via facsimile, as though it were an original document, so long as the original executed copy is immediately forwarded to the other party.

21.    Non-Waiver.     No delay or failure by Company or Hurley to exercise any right under this

Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other

right.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date

and year first written above.

Independent Contractor

Kevin Hurley

Rangeley Lake Vacation Club, LLC

By:  Perry D. Williams,
Its Manager

G:\USERS\JANICE\REALEST\Rangeley Lake Resort\INDEPENDENT CONTRACTOR AGREEMENT 71101.doc

8